*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MCFARLAND REAL ESTATE, LLC,

      Plaintiff/Counter-Defendant-
      Appellant,

v

ANDERSON WOODS CONDOMINIUM
ASSOCIATION,

      Defendant/Counter-Plaintiff/Third-
      Party Plaintiff-Appellee,

and

LAKE MICHIGAN CREDIT UNION,

      Third-Party Defendant.

UNPUBLISHED
May 16, 2019

No. 342566
Kent Circuit Court
LC No. 17-006819-CB

Before: SWARTZLE, P.J., and M. J. KELLY and TUKEL, JJ.

PER CURIAM.

Plaintiff/counter-defendant, McFarland Real Estate, LLC, appeals by right a judgment entered in favor of defendant/counter-plaintiff/third-party plaintiff, Anderson Woods Condominium Association, awarding Anderson Woods a total of $15,222.77, including attorney fees, costs, and interest. We affirm.

## I. BASIC FACTS

McFarland owns Lot 38 in Anderson Woods in Cascade Township, Michigan. The lot is vacant, but it has a lateral connection to a community sewer system. This dispute involves whether Lot 38 is subject to a $500 annual sewerage assessment for costs associated with maintaining and operating the community sewer system. Following a bench trial, the trial court held that under the governing condominium documents, Lot 38 was subject to the annual sewer assessment, and it entered a verdict in favor of Anderson Woods. The trial court also entered a

-1-

judgment in favor of Anderson Woods that included an award of attorney fees, costs, and interest.

## II.  SEWER ASSESSMENT

## A.  STANDARD OF REVIEW

McFarland argues that the trial court erroneously interpreted the condominium documents.  "Following a bench trial, this Court reviews the trial court's conclusions of law de novo, and its findings of fact for clear error."  *Mettler Walloon, LLC v Melrose Twp*, 281 Mich App 184, 195; 761 NW2d 293 (2008).  The trial court's factual findings are clearly erroneous if the reviewing court is "left with a definite and firm conviction that a mistake has been made."  *Id*.  To the extent that this Court must interpret the condominium's governing documents, the documents are akin to a contract, see *Rossow v Brentwood Farms*, 251 Mich App 652, 658-659; 651 NW2d 458 (2002), and "[q]uestions involving the proper interpretation of a contract or the legal effect of a contractual clause are . . . reviewed de novo," *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 197; 747 NW2d 811 (2008).

## B.  ANALYSIS

The relevant condominium documents involved include the master deed, the 2005 amendment to the master deed, the 2007 amendment to the master deed, and the bylaws.  In interpreting these documents, we apply the rules governing construction of a contract.  See *Rossow*, 251 Mich App at 658-659.  "The primary goal in interpreting contracts is to determine and enforce the parties' intent."  *Old Kent Bank v Sobczak*, 243 Mich App 57, 63; 620 NW2d 663 (2000).  "To do so, this Court reads the agreement as a whole and attempts to apply the plain language of the contract itself."  *Id*.  "However, when a contract is ambiguous, this Court may construe the agreement in an effort to find and enforce the parties' intent."  *Id*.  "In interpreting contracts capable of two different constructions, we prefer a reasonable and fair construction over a less just and less reasonable construction."  *Schroeder v Terra Energy, Ltd*, 223 Mich App 176, 188; 565 NW2d 887 (1997).

In 2005, Anderson Woods recorded an amendment to the master deed; the 2005 amendment authorized Anderson Woods to create a "special assessment district" to facilitate the construction of a common sewage disposal system.  The operative language provides in relevant part:

> At some time subsequent to the initial development, it may become necessary to construct a community water supply and/or sewage disposal system . . . .  The construction of such public systems, or either of them, may be financed, in whole or in part, by the creation of a special assessment district or districts which may include all units in the Condominium. . . .  The Board of Directors of the Association *shall be vested with full power and authority to obligate all co owners to participate in a special assessment district or districts* and to consider and act upon all other community water and sewer issues on behalf of the Association and all co-owners.  Further, *each Owner will pay such*

*special assessments as may be levied against his unit* by any such special assessment district . . . . [Emphasis added.]

In 2007, the developer of Anderson Woods entered into a sewerage agreement with Cascade Township to establish the community sewer system referred to in the 2005 amendment. Thereafter, on December 13, 2007, the master deed was again amended. The 2007 amendment included the following provisions concerning the operation and maintenance of the sewage system:

> The Association owns and operates the waste sewerage system. . . . The Association shall assess the co-owners *using* the sewerage system for the cost of operation, maintenance, repair and replacement of the sewerage system and for payments made into the perpetual escrow fund for the sewerage system . . . . The Association and the *units utilizing the sewerage system* are further regulated by a Private Sewer System Agreement between the Developer and Cascade Charter Township . . . and by the Restrictive Covenant Running With the Land, being recorded at or near the time of this Amendment.

> The Developer will be responsible for the initial construction and installation of the sewerage system . . . . The Association shall thereafter be responsible for the maintenance, repair and ultimate replacement of the sewerage system . . . . *All costs of such maintenance, repair and/or replacement shall be assessed to the Co-Owners with units serviced by* the sewerage system. [Emphasis added.]

The 2007 amendment also modified Article III, § 3(b) of the bylaws to include the following language:

> Specifically, but not by way of limitation, the Association shall separately assess the owners of Units 35-42 for the costs associated with maintaining the shared drain field system servicing those Units. The Association may hire an independent contractor to service such shared drain filed [sic] system.

The trial court concluded that the above documents, when read together, created an ambiguity. We agree. The 2005 amendment provides that co-owners "will pay" assessments levied by the board of directors for the sewer district. The 2007 amendment provides that the costs for maintaining and operating the sewer system "shall" be assessed to co-owners *using* the system. The 2007 amendment additionally states that those same costs "shall be assessed to co-owners with units *serviced by* the sewerage system." (Emphasis added.) The inclusion of the terms "using" and "serviced by" renders the documents ambiguous. "A contract is ambiguous when two provisions irreconcilably conflict with each other, or when [a term] is equally susceptible to more than a single meaning." *Coates v Bastian Bros, Inc*, 276 Mich App 498, 503; 741 NW2d 539 (2007) (quotation marks and citations omitted; alteration in original). The terms "using" and "serviced by" irreconcilably conflict because it is possible for a lot to be serviced by the sewer system, but not use the system. For example, in this case, Lot 38 is serviced by the sewerage system. The lot contains a lateral connection to the main sewer line and is included within the special assessment district. In other words, the lot is serviced by the

sewer system because it is connected to the sewer system and ready for a home to be hooked into the system. However, the lot is vacant, and therefore, does not *use* the sewer system.

Yet, "[a] cardinal principle of construction is that a contract is to be construed as a whole, and all parts are to be harmonized as far as possible." *Czapp v Cox*, 179 Mich App 216, 219; 445 NW2d 218 (1989). Thus, this Court should interpret the documents as a whole, not piecemeal. The master deed incorporates the bylaws. Construing these documents as a harmonious whole shows that the intent of the documents was to allocate costs for maintaining and operating the sewerage system to each of the lots in the special assessment district. Importantly, the 2005 amendment included broad language authorizing the board of directors to create a special assessment district and to "act upon *all* other community water and sewer issues on behalf of the Association and all co-owners" and provided that all co-owners in the assessment district "*will pay* such special assessments as may be levied against his unit by any such special assessment district." (Emphasis added.)

The board's authority to impose assessments on all of the lots in the special assessment district is further illustrated in Article III, § 3 and Article III, § 3(b) of the bylaws. Specifically, Article III, § 3 provides that the board has "*all powers and duties* necessary for the administration of the affairs of the Condominium and may do *all things* which are *not prohibited* by law or the Condominium Documents . . . ." While the relevant documents discussed earlier contain ambiguous provisions, nothing in the language of those documents prohibits the board from imposing the assessment on all lots included within the special assessment district. In short, the broad language in Article III, § 3 of the bylaws authorizes the board to impose the sewer assessment on all of the lots in the special assessment district.

Article III, § 3(b) of the bylaws further supports this conclusion. As noted earlier, the 2007 amendment amended this provision to provide that "[the] Association shall separately assess the owners of Units 35-42 for the costs associated with maintaining the shared drain field system servicing those Units." By explicitly providing in the bylaws that the assessment *shall* be applied to Lots 35 through 42 for maintaining the "shared drain field system servicing those Units," it is clear that the intent of this language was to allocate costs of the sewer system to *all* of the lots included within the special assessment district.

Finally, MCL 559.169 further supports that the documents were drafted to allocate the expenses of the sewer assessment to all of the lots within the special assessment district. MCL 559.169(1) provides that "[e]xcept to the extent that the condominium documents provide otherwise, common expenses . . . shall be specially assessed against the condominium unit to which that limited common element was assigned." In this case, the sewer system is a limited common element that was assigned to Lots 35 through 42. The Anderson Woods condominium documents do not conflict with MCL 559.169(1). Reading the documents as a whole indicates that the costs should be allocated to all of the lots within the special assessment district. The documents do not "provide otherwise."

McFarland argues that the trial court erred in finding an ambiguity as opposed to a mutual mistake of fact. McFarland argues that the mutual mistake of fact warrants reversal and remand for reformation of the condominium documents. This argument lacks merit.

-4-

"Michigan courts sitting in equity have long had the power to reform an instrument that does not express the true intent of the parties as a result of fraud, mistake, accident, or surprise." *Johnson Family Ltd Partnership v White Pine Wireless, LLC*, 281 Mich App 364, 371-372; 761 NW2d 353 (2008). A "mutual mistake of fact" is "an erroneous belief, which is shared and relied on by both parties, about a material fact that affects the substance of the transaction." *Ford Motor Co v Woodhaven*, 475 Mich 425, 442; 716 NW2d 247 (2006). "[T]he party seeking reformation must prove the mutual mistake by clear and satisfactory evidence, so as to establish the fact beyond cavil." *Johnson Family Ltd Partnership*, 281 Mich App at 379 (quotation marks and citations omitted).

In this case, McFarland argues that the trial court should have found a mutual mistake of fact when it concluded that the drafters assumed that none of the lots would remain vacant. However, as discussed earlier, although when read separately there are provisions that are ambiguous, when read as a harmonious whole, the condominium documents show that the intent of the contract was to allocate costs of the sewer system to each of the lots in the special assessment district irrespective of whether the lots are vacant. Therefore, McFarland has failed to show a mutual mistake of fact by "clear and satisfactory evidence." *Id*.

McFarland also argues that the trial court considered the wrong extrinsic evidence in interpreting the documents. McFarland is correct that in *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 469; 663 NW2d 447 (2003), the Michigan Supreme Court explained that "[w]here a written contract is ambiguous, a factual question is presented as to the meaning of its provisions, requiring a factual determination as to *the intent of the parties in entering the contract*." (Quotation marks and citation omitted; emphasis added). However, in this case, consideration of extrinsic evidence concerning the conduct of the drafters of the documents was not necessary because the ambiguity could be resolved by reading the governing documents as a harmonious whole. See *Sobczak*, 243 Mich App at 63 (stating that in interpreting a contract this Court "reads the agreement as a whole and attempts to apply the plain language of the contract itself."). To the extent the trial court concluded otherwise, the trial court committed harmless error. See *Gleason v Mich Dep't of Transp*, 256 Mich App 1, 3; 662 NW2d 822 (2003) ("A trial court's ruling may be upheld on appeal where the right result issued, albeit for the wrong reason.").

In sum, construing the condominium documents as a harmonious whole indicates that the intent of the contract was to allocate costs of maintaining and operating the sewer system to all of the lots within the special assessment district irrespective of whether the lot remained vacant. Therefore, the trial court did not err by holding that Anderson Woods had authority to impose the assessment on Lot 38 and in entering a verdict in favor of Anderson Woods.

III. ATTORNEY FEES

A. STANDARD OF REVIEW

McFarland argues that the trial court erred by awarding $14,153.75 in attorney fees. "We review for an abuse of discretion a trial court's award of attorney fees and costs." *Smith v Khouri*, 481 Mich 519, 526; 751 NW2d 472 (2008). "An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes." *Id*.

B. ANALYSIS

"As a general rule, attorney fees are not recoverable as an element of costs or damages absent an express legal exception." *Fleet Business Credit v Krapohl Ford Lincoln Mercury Co*, 274 Mich App 584, 589; 735 NW2d 644 (2007). Attorney fees are recoverable if expressly provided for by a contract between the parties. *Id*. In this case, the condominium documents constitute a contract between the parties. Under Article XI, § 1(b) of the bylaws, Anderson Woods was entitled to attorney fees.

When attorney fees are recoverable, "the burden of proving the reasonableness of the requested fees rests with the party requesting them." *Smith*, 481 Mich at 528-529. When establishing the reasonableness of a fee, the court must begin by determining the fee customarily charged in the locality for similar legal services. *Id*. at 530. Next, the court must determine whether the number of hours expended was reasonable. *Id*. at 531. Here, the parties agreed that the number of hours claimed and the hourly rate was reasonable.

The next step is for the court to consider the following, nonexclusive, list of factors:

> (1) the experience, reputation, and ability of the lawyer or lawyers performing the services,

> (2) the difficulty of the case, i.e., the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly,

> (3) the amount in question and the results obtained,

> (4) the expenses incurred,

> (5) the nature and length of the professional relationship with the client,

> (6) the likelihood, if apparent to the client, that acceptance of the particular employment will preclude other employment by the lawyer,

> (7) the time limitations imposed by the client or by the circumstances, and

> (8) whether the fee is fixed or contingent. [*Pirgu v United Servs Auto Ass'n*, 499 Mich 269, 282; 884 NW2d 257 (2016).]

In this case, the trial court considered each factor, and determined that a downward adjustment of the requested fees was not warranted. The trial court reasoned:

> First, 'the experience, reputation, and ability of [Anderson Woods' lawyer] does not warrant any adjustment. Second, 'the difficulty of the case' does not support any adjustment. Although the case was resolved quickly, it involved several thorny legal issues. Third, 'the amount in question and the results obtained' might provide a basis for a downward adjustment because the dispute over a $500 annual sewerage assessment seems insubstantial, but both sides made complicated arguments based upon convoluted documents and [Anderson Woods' lawyer]

-6-

achieved an excellent outcome, so the Court chooses not to make an adjustment on the basis of the third factor. Fourth, 'the expenses incurred' do not warrant any adjustment. Indeed, neither side focused much attention on expenses related to the litigation. Fifth, 'the nature and length of the professional relationship with the client' might justify an upward adjustment because [Anderson Woods' lawyer] gave Anderson Woods a discounted rate, but the Court cannot fathom any upward adjustment under the circumstances of this case. Sixth, nothing in the record suggests that [Anderson Woods' lawyer] had to decline other matters in order to handle the instant case. Seventh, the Court imposed a strict time limit by setting the matter for a prompt trial, but neither [Anderson Woods' lawyer] nor Anderson Woods has asked the Court to provide an upward adjustment based upon that time constraint. Finally, [Anderson Woods' lawyer] billed Anderson Woods by the hour at a discounted rate, so the nature of the fee arrangement does not support any adjustment, either upward or downward. [citations omitted.]

The trial court then evaluated three other "considerations" that McFarland identified as supporting a downward adjustment. The court may consider other factors. See *Pirgu*, 499 Mich at 282. The court reasoned:

First, McFarland asserts that the Court found the controlling documents to be ambiguous, so the attorney-fee award should be reduced to reflect that lack of clarity. To be sure, the Court found that the governing documents failed to anticipate that a member of Anderson Woods would not develop one of the lots subject to the sewerage assessment, but the resulting lack of clarity was debated extensively by the parties before they commenced litigation, and so both sides understood that litigating the matter would necessarily be costly. As it turned out, they were right. To the extent that McFArland seeks relief from the fee-shifting provision in the bylaws because the questions presented by the parties were debatable, the Court cannot rewrite the bylaws to furnish an escape hatch when a dispute with Anderson Woods involves a close question. Second, McFarland insists that awarding attorney fees in this case will embolden Anderson Woods and deter members from challenging impermissible acts by Anderson Woods. The "rule of reason" applied by our Court of Appeals to disputes with condominium associations requires substantial deference, see Bruce A Cohan, MD, PC v Riverside Park Place Condo Ass'n, 123 Mich App 743, 746 (1983), and thereby emboldens condominium associations as well, but that rule—just like the fee-shifting provision in the Anderson Woods bylaws—serves the important purpose of enabling a condominium association to exercise its best judgment without putting at risk the financial well-being of its entire membership. Finally, McFarland complains that "the requested fees are not reasonable in proportion to the amount in dispute." That argument rings hollow because McFArland started this lawsuit with a five-count complaint that went so far as to demand "costs incurred in bringing this action, including attorney fees, and exemplary damages[.]" Thus, McFarland not only started this litigation, but also raised the stakes dramatically in its prayer for relief. The Court cannot penalize Anderson Woods for simply fighting back. [Citation to complain omitted.]

-7-

On appeal, McFarland argues that the trial court should have made a downward adjustment under the third *Pirgu* factor, i.e., 'the amount in question and the results obtained." He asserts that the court abused its discretion because it ignored that the "convoluted documents" were maintained by Anderson Woods, it ignored the fact that Anderson Woods' decision to file a lien on the property necessitated the lawsuit, and it ignored that the "excellent outcome" was only achieved by Anderson Woods' lawyer following a bench trial that was not preceded by discovery.

In addition, McFarland contends that the court abused its discretion when it weighed the "other factors." McFarland asserts that the litigation was expensive to both parties, and the court's order effectively doubled the cost he had to pay for the litigation. He also takes issue with the fact that, until it filed a lien on his property, Anderson Woods never articulated a credible argument for the sewer assessment. McFarland contends that the grounds relied on by the trial court for awarding relief—lack of clarity in the documents—was not an argument raised by Anderson Woods. McFarland further complains that the court's ruling will have a chilling effect on the condominium members' willingness to challenge Anderson Woods in the future. He asserts that a downward adjustment would have an opposite effect in that it would encourage Anderson Woods to allocate resources to fix the problem with the documents as opposed to engaging in expensive litigation. McFarland asserts that contrary to the trial court's reasoning, Anderson Woods necessitated the filing of the lawsuit by filing a lien on his property over a $500 dispute, which caused McFarland to default on his mortgage. Finally, he contends that the trial court improperly penalized him for seeking the relief he was entitled to seek in his prayer for relief.

McFarland's argument amounts to a marshaling of reasonable and principled reasons that the trial court could have made a downward adjustment of the attorney-fee award. However, McFarland fails to appreciate that under the abuse of discretion standard "there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome." *Maldonado v Ford Motor Co*, 476 Mich 372, 388, 719 NW2d 809 (2006). Further, a ruling on a close question is not ordinarily an abuse of discretion. See *Barr v Farm Bureau Gen Ins Corp*, 292 Mich App 456, 458; 806 NW2d 531 (2011). Based on our review of the case, it is clear that the reasons for not making a downward adjustment are reasonable and principled. As a result, we discern no abuse of discretion on this close issue, notwithstanding McFarland's arguments in support of a different outcome that, under the circumstances, could also be considered reasonable and principled.

Affirmed. Anderson Woods may tax costs as the prevailing party. MCR 7.219(A).

/s/ Brock A. Swartzle
/s/ Michael J. Kelly
/s/ Jonathan Tukel

-8-